[Cite as *Booth v. Lazzara*, 2026-Ohio-225.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


BRANDI BOOTH, AS                          :
ADMINISTRATRIX OF THE ESTATE
OF DUSTIN L. BOOTH,                        :        CASE NO. CA2025-05-038

    Appellant,                             :        OPINION AND
                                           JUDGMENT ENTRY
                                            :        1/26/2026
    - vs -
                                             :

JONATHAN LAZZARA, D.O.,                    :

    Appellee.


CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 24CV98035


Kircher Law, LLC, and Konrad Kircher, for appellant.

Reminger Co., LPA, and Brianna M. Prislipsky, and Susan Blasik-Miller, and Meredith Turner-Woolley, for appellee.


# **O P I N I O N**


**HENDRICKSON, P.J.**

{¶ 1} Plaintiff-appellant, Brandi Booth, as the administratrix of the estate of her late husband, Dustin Booth, appeals from a decision of the Warren County Court of Common Pleas granting summary judgment to defendant-appellee, Jonathan Lazzara,

D.O. ("Dr. Lazzara"), on Brandi's claims for professional negligence and wrongful death.[1] For the reasons set forth below, we affirm the judgment of the trial court.

**FACTS AND PROCEDURAL HISTORY**

{¶ 2} On October 15, 2024, Brandi filed a negligence, wrongful death, and survivorship action against Dr. Lazzara. The complaint alleged that Dr. Lazzara acted negligently in the treatment, care, diagnosis, and discharge of Dustin Booth, a patient Dr. Lazzara treated between February 2 and February 7, 2022.

{¶ 3} The allegations of the complaint stemmed from a series of events that began in mid-January 2022. Around that time, Dustin's wife, Brandi Booth, and his mother both noticed a change in Dustin's overall behavior. These changes included low amounts of sleep, sudden weight loss, increased motivation to complete projects, a heightened interest in odd topics, and an increased use of his vape pen and cannabis products. In the early morning hours of February 1, 2022, Dustin's mother and Brandi were particularly concerned with Dustin's behavior, and ultimately, called law enforcement and requested assistance. After speaking with Dustin, officers contacted a crisis team from Butler Behavioral Health, and subsequently transported Dustin to the emergency room at Atrium Medical Center.

{¶ 4} A health officer with Butler Behavioral Health filed an application for emergency admission pursuant to R.C. 5122.01 and 5122.10. In the application, the officer stated that Dustin was "a mentally ill person subject to hospitalization by court order[.]" This admission process, commonly referred to by law enforcement and hospital personnel as the "pink slip" process, allows an officer to involuntarily commit a person to a care facility based upon the circumstances presented to the officer at that time. The

---

1. Pursuant to Loc.R. 6(A), we sua sponte remove this appeal from the accelerated calendar for purposes of issuing this opinion.

"pink slip" itself refers to the notice officers provide to the person that he or she is being committed, pursuant to R.C. Chapter 5122, to a 72-hour hold at a care facility.

{¶ 5} Dustin was later transferred to the behavioral health unit at Atrium Medical Center, where he remained until he was discharged on February 7, 2022. Throughout Dustin's admission to the behavioral health unit, Dr. Lazzara, the director of psychiatry, provided care and treatment to Dustin. As part of that treatment, Dr. Lazzara diagnosed Dustin with Bipolar Disorder I with mania and began Dustin on various medications.

{¶ 6} After observing improvement from Dustin, including compliance with his medication and an improved state of mind, Dr. Lazzara discharged Dustin on February 7, 2022. At some point during his admission, Dustin directed Dr. Lazzara not to speak with his wife, Brandi, regarding his treatment or care. As a result of that directive, Dr. Lazzara ceased communication with Brandi, and Dustin's mother assisted with Dustin's discharge.

{¶ 7} Upon his discharge from the hospital, Dustin returned home where he resumed use of his vape pen and, according to Dustin's mother and Brandi, his behavior quickly deteriorated. On February 11, 2022, police responded to a call from Brandi that Dustin was behaving strangely. After police initiated a traffic stop, Dustin engaged in a stand-off with law enforcement officers, who ultimately shot Dustin several times. Dustin was transported to the hospital where he succumbed to his injuries during surgery.

{¶ 8} Following Dustin's death, Brandi filed the instant complaint against Dr. Lazzara.[2] The parties engaged in discovery and then, on January 28, 2025, Dr. Lazzara moved for summary judgment. In his motion, Dr. Lazzara argued that he was entitled to

---

2. The parties represent that Brandi initially filed suit against Dr. Lazzara and other defendants in federal court. After summary judgment proceedings in the federal court, Brandi's claims against the other defendants were resolved and only the state law claims against Dr. Lazzara remain. Aside from Brandi's allegation in her complaint that "this case is a refiling of claims dismissed without prejudice by the United States District Court for the Southern District of Ohio," the details regarding Brandi's initial lawsuit are absent from the record before this court. Thus, the only issue before this court is whether the trial court erred in awarding summary judgment on Brandi's claims refiled against Dr. Lazzara.

statutory immunity pursuant to R.C. 5122.34, which provides that medical professionals who, acting in good faith, procedurally or physically assist in the hospitalization or discharge of a mental health patient, are free from any liability to the patient or others. In support of his motion for summary judgment, Dr. Lazzara attached the February 1, 2022 Application for Emergency Admission, as well as affidavits from Dr. Lazzara, Dr. Stephen Noffsinger, and Dr. Paul Keck. In those affidavits, each doctor opined that he is board certified in psychiatry and, in his expert opinion, Dr. Lazzara acted lawfully and in good faith in his treatment and discharge of Dustin. Dr. Lazzara also filed transcripts from various depositions in support of his motion for summary judgment, including his deposition taken on February 28, 2023, as well as the depositions of Dr. Benjamin T. Thatcher, an expert retained by Brandi, and Robert Buchanan, the City of Monroe's chief of police.

{¶ 9} Brandi filed a response in opposition to summary judgment, arguing that R.C. 5122.34 does not apply to the circumstances of this case and that, if the statute does apply, there are genuine issues of material fact concerning Dr. Lazzara's good faith. In support of her response, Brandi relied upon the depositions of three hospital employees who were involved in Dustin's treatment, as well as the depositions of Brandi and Dustin's mother. Brandi also provided various deposition exhibits, including the written expert opinion of Dr. Thatcher and paper handouts concerning the diagnostic criteria for Cannabis Use Disorder and Bipolar I Disorder.

{¶ 10} In his written opinion filed with the trial court, Dr. Thatcher stated, in relevant part, the following:

> It is my opinion, with reasonable medical certainty, that Dr. Lazzara deviated from the standard of care while treating Dustin Booth as an inpatient psychiatric patient at Atrium Medical Center from 2/1/2022 to 2/7/2022. Dr. Lazzara

- 4 -

deviated below the standard of care when:

1.  He failed to gather collateral information from family members by communicating with them after they had reached out to him for consultation . . .

2.  He failed to properly diagnose Mr. Booth with 2 substance use disorders: alcohol use disorder and cannabis use disorder . . .

3.  He failed to offer FDA approved medications and evidence-based treatments for substance abuse disorders.

4.  He discharged Mr. Booth prematurely in an unsafe mental state . . .

5.  He failed to create and implement a discharge plan that adhered to prevailing standards that prioritize patient and community safety . . .

6.  He failed to properly utilize the civil commitment system to maximize the safety of Mr. Booth, his family, and the community . . .

{¶ 11} Dr. Thatcher further stated that, in his opinion, with reasonable medical certainty, Dustin suffered harm from Dr. Lazzara's deviations from the standard of care listed above.

{¶ 12} On May 22, 2025, the trial court issued a decision granting Dr. Lazzara's motion for summary judgment on Brandi's claims. In its decision, the trial court found that Dr. Lazzara was entitled to statutory immunity pursuant to R.C. 5122.34 and that when viewing the evidence in the light most favorable to the non-moving party, there was no genuine issue as to material facts and that summary judgment was appropriate as a matter of law. In so doing, the trial court found that, "[u]pon review of all the evidence . . . [Dr. Lazzara] has met his burden to make a prima face [sic] showing that Dr. Lazzara acted in good faith . . . Upon further review, the Court finds that [Brandi] has failed to rebut this evidence to create a genuine issue as to material fact. [Brandi]'s arguments pertain

- 5 -

to best practice but do not support an argument of bad faith."

## Analysis

{¶ 13} Brandi now appeals from the trial court's decision, raising two assignments of error for this court's review.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT BY DETERMINING THAT THE IMMUNITY OF R.C. 5122.34 APPLIES TO PHYSICIANS WHO PROVIDE NEGLIGENT TREATMENT TO A PATIENT AT ANY TIME DURING THE COURSE OF AN INVOLUNTARY ADMISSION.

{¶ 16} Assignment of Error No. 2:

{¶ 17} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING APPELLEE'S GOOD FAITH.

{¶ 18} On appeal, Brandi argues the trial court erred when it granted summary judgment in favor of Dr. Lazzara. Specifically, Brandi claims Dr. Lazzara is not entitled to immunity pursuant to R.C. 5122.34 for his negligent treatment of Dustin during his hospitalization and that there are genuine issues of material fact regarding Dr. Lazzara's "good faith."

## Standard of Review

{¶ 19} "An appellate court's examination of a trial court's decision to grant summary judgment is subject to de novo review." *French v. New Paris*, 2011-Ohio-1309, ¶ 17 (12th Dist.), citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). De novo review means that this court uses the same standard that the trial court should have used and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial. *Morris v. Dobbins Nursing Home*, 2011-Ohio-3014, ¶ 14 (12th Dist.).

- 6 -

{¶ 20} Civ.R. 56 sets forth the summary judgment standard. "Pursuant to that rule, a court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party." *Spitzer v. Frisch's Restaurants, Inc.*, 2021-Ohio-1913, ¶ 6 (12th Dist.), citing *BAC Home Loans Servicing, L.P. v. Kolenich*, 2011-Ohio-3345, ¶ 17 (12th Dist.). "A material fact is one which would affect the outcome of the suit under the applicable substantive law." *Hillstreet Fund III, L.P. v. Bloom*, 2010-Ohio-2961, ¶ 9 (12th Dist.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 21} The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists. *Touhey v. Ed's Tree & Turf, L.L.C.*, 2011-Ohio-3432, ¶ 7 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Once this burden is met, the nonmoving party "'must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in her pleadings.'" *Oliphant v. AWP, Inc.*, 2020-Ohio-229, ¶ 31 (12th Dist.), quoting *Deutsche Bank Natl. Trust Co. v. Sexton*, 2010-Ohio-4802, ¶ 7 (12th Dist.), citing Civ.R. 56(E). "Summary judgment is proper if the nonmoving party fails to set forth such facts." *Taylor v. Atrium Med. Ctr.*, 2019-Ohio-447, ¶ 10 (12th Dist.). "In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party." *Auto Recyclers of Middletown, Inc. v. Stein, L.L.C.*, 2025-Ohio-414, ¶ 26 (12th Dist.).

**Application of R.C. 5122.34**

{¶ 22} As noted above, the trial court granted summary judgment in favor of Dr. Lazzara by determining that Dr. Lazzara was immune from liability pursuant to R.C. 5122.34(A). That statute states, in relevant part, that

[p]ersons, including, but not limited to, boards of . . . mental health services and community mental health services providers, acting in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assist in the hospitalization or discharge . . . of a person under this chapter . . . are free from any liability to the person hospitalized or receiving court-ordered treatment or to any other person.

{¶ 23} In her first assignment of error, Brandi argues the trial court erred in granting summary judgment to Dr. Lazzara because R.C. Chapter 5122 does not apply to the circumstances of this case. As such, we will begin by analyzing the scope of R.C. 5122.34 and determining whether R.C. 5122.34 could provide immunity to Dr. Lazzara given the facts of this case.

{¶ 24} Brandi contends that, pursuant to R.C. 5122.011, R.C. Chapter 5122 only applies in proceedings where individuals are found incompetent to stand trial or not guilty by reason of insanity and are committed pursuant to R.C. 2945.39, 2945.40, 2945.401 or 2945.402.[3] In support, Brandi cites to *Bostic v. Salvation Army*, 2023-Ohio-933 (8th Dist.), for the proposition that R.C. Chapter 5122 "applies to those who are found incompetent to stand trial or who are found not guilty by reason of insanity." Because Dustin is not such a person, Brandi claims R.C. 5122.34 cannot provide immunity to Dr. Lazzara for his treatment and discharge of Dustin.

{¶ 25} After our review, we disagree that the application of R.C. Chapter 5122 is limited to civil commitments involving individuals found incompetent to stand trial or not guilty by reason of insanity in a criminal proceeding. Despite the court's holding in *Bostic*, other Ohio courts, including the Ohio Supreme Court, have applied R.C. 5122.34 more

___

3. R.C. 5122.011 states that "[t]he provisions of this chapter regarding hospitalization apply to a person who is found incompetent to stand trial or not guilty by reason of insanity and is committed pursuant to section 2945.39, 2945.40, 2945.401 or 2945.402 of the Revised Code[.]"

broadly, and have considered R.C. 5122.34 in cases involving involuntary civil commitments, as well as the continued hospitalization and discharge of involuntarily committed patients. *See Loughran v. Kettering Mem. Hosp.*, 126 Ohio App. 3d 468, 474-475 (1998 2d Dist.); *Piper v. Bruno*, 2011-Ohio-587, ¶ 16, 19-24 (3d Dist.); *Johnson v. Patel*, 2008-Ohio-596, ¶ 40 (5th Dist.); *Yayathi v. Chittiprolu*, 2006-Ohio-6897 (10th Dist.). Additionally, although R.C. 5122.011 provides that R.C. Chapter 5122 applies to specific individuals, there is nothing in the statute, or the remainder of R.C. Chapter 5122, stating the immunity found in R.C. 5122.34 is limited to situations involving the individuals identified in R.C. 5122.011.[4]

{¶ 26} Notably, the Ohio Supreme Court has acknowledged that "R.C. 5122.34 does not apply to immunize mental health professionals from liability in all contexts[,]" but "it applies to mental health professionals 'who procedurally or physically assist in the hospitalization or discharge . . . *of a person* under this chapter.'" *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 1997-Ohio-194, ¶ 71. (Emphasis added.) In this case, it is undisputed that Dustin was hospitalized pursuant to R.C. 5122.10, i.e., the "pink slip process," during which a health officer stated that Dustin was a mentally ill person subject to hospitalization by court order pursuant to R.C. 5122.01(B)(3).[5] As such, because Brandi's claims pertain to the conduct of Dr. Lazzara, a mental health professional, in connection with the hospitalization and discharge of Dustin, a "person" subject to hospitalization pursuant to R.C. 5122.01(B)(3), we find the immunity provision of R.C. 5122.34 can provide immunity to Dr. Lazzara in this case. *Id.* ("the General Assembly has made a policy decision that those who assist in hospitalizing, placing or discharging *a*

---

4. At oral argument before this court, Brandi conceded that the immunity provided by R.C. 5122.34 can apply in more situations than those defined in R.C. 5122.011.

5. Brandi does not challenge the lawfulness of Dustin's emergency hospitalization, nor does she claim the procedures of R.C. 5122.10 to commit Dustin were not followed.

*person under R.C. Chapter 5122* are not liable" for certain claims). (Emphasis added.)

{¶ 27} Brandi next argues that R.C. 5122.34 does not apply to her professional negligence claim against Dr. Lazzara because the immunity provided by the statute "applies to decisions and procedures to admit or discharge pink slip patients, or to the decisions and procedures to keep them hospitalized, not to the quality of care they are given during their hospitalization." Although Brandi concedes that at least some of her claims against Dr. Lazzara pertain to his discharge of Dustin, and acknowledges that such conduct would fall under the purview of R.C. 5122.34, she contends her claims involving the quality of treatment provided to Dustin during his hospitalization do not fall under the language of the statute. Specifically, Brandi argues R.C. 5122.34 does not protect Dr. Lazzara from liability stemming from his failure to diagnose Dustin with a substance abuse disorder or to properly treat that disorder.

{¶ 28} Brandi's argument is premised upon her interpretation of the word "hospitalization" to mean "admission," not the duration of time a patient is hospitalized. After our review, there is nothing in R.C. Chapter 5122 to suggest that the legislature intended to use the term "hospitalization" in R.C. 5122.34(A) as synonymous with "admission." The legislature chose specific words to protect mental health professionals who procedurally or physically assist in the "hospitalization or discharge" of a person under R.C. Chapter 5122. Had the legislature intended mental health professionals to be protected only for their assistance provided during the "*admission* or discharge" of such individuals, the legislature could have used words to that effect.[6] This is especially true

---

6. The term "hospitalization" is not defined by the statute but is defined in *Merriam-Websters Medical Dictionary* as "the act or process of being hospitalized" and "the period of stay in a hospital." Merriam-Webster Online, https://www.merriam-webster.com/medical/hospitalization (accessed Jan. 14, 2026). According to R.C. 5122.01(T), "'[a]dmission' to a hospital or other place means that a patient is accepted for and stays at least one night at the hospital or other place."

given the legislature's decision to define "admission" in R.C. 5122.01, but not to use the word in R.C. 5122.34.

{¶ 29} Furthermore, and contrary to Brandi's assertion otherwise, at least one other Ohio court has applied R.C. 5122.34(A) to find a doctor immune from claims concerning the doctor's treatment of a patient "during his hospital stay" and the doctor's diagnosis of that patient. *See Johnson*, 2008-Ohio-596 at ¶ 12, 58-60 (R.C. 5122.34 immunity applied to claims that mental health professionals "failed to exercise the ordinary degree of care, skill and diligence in their diagnosis, care, and treatment of" the patient). Given the language utilized by the legislature in the statute, we see no reason to apply R.C. 5122.34(A) any differently. Consequently, to the extent Brandi's claims against Dr. Lazzara stem from his physical or procedural assistance throughout Dustin's hospitalization, as opposed to his discharge on February 7, 2022, we find R.C. 5122.34 can protect Dr. Lazzara from liability if the remaining statutory requirements are met.[7]

**Good Faith Requirement**

{¶ 30} We now turn to the good faith requirement of R.C. 5122.34(A) and Brandi's argument that, even if R.C. 5122.34(A) applies to the facts of this case, Dr. Lazzara did not act in good faith, and therefore, is not entitled to immunity from liability.

{¶ 31} Immunity is generally regarded as an affirmative defense. *Turner v. Cent. Local School Dist.*, 1999-Ohio-207, ¶ 13.[8] An affirmative defense operates as a confession and avoidance. Civ.R. 8(C). "It admits for pleading purposes that the plaintiff

---

7. Even if, as Brandi argues, the term "hospitalization" meant "admission," the substance of Brandi's claims are based upon Dr. Lazzara's decision to discharge or release Dustin prior to issuing a proper diagnosis and treating that diagnosis. As such, because Brandi's claims are integrally tied to Dr. Lazzara's physical and procedural assistance with Dustin's discharge, he could be immune from liability for his conduct under these circumstances if the remaining elements of the statute are met.

8. In his answer to Brandi's complaint, Dr. Lazzara stated, as his seventh defense, that he "acted in good faith and has immunity for plaintiff's claims pursuant to Ohio Revised Code §5122.34."

has a claim (the 'confession') but asserts some legal reason why the plaintiff cannot have recovery on that claim. (the 'avoidance')." *Loughran*, 126 Ohio App. 3d 468, at 474, citing 1 Baldwin's Ohio Civil Practice (1988), Section 8–14, at 648. Therefore, Dr. Lazzara's motion for summary judgment imposed on him the burden to show that there was no genuine issue of material fact concerning the grounds for immunity in R.C. 5122.34. To do so, Dr. Lazzara was required to show that he had acted in good faith when he assisted in the hospitalization and discharge of Dustin. If Dr. Lazzara produced such evidence, Brandi was then required to offer evidence to contradict that proposition.

{¶ 32} The standard of care required to satisfy a physician's duty of good practice is dictated by the custom of the profession and is, therefore, an objective standard. *Littleton v. Good Samaritan Hosp.*, 39 Ohio St.3d 86, 93 (1988). The good faith rule of R.C. 5122.34, however, creates a subjective standard of conduct which avoids any liability that otherwise results from a defendant's breach of a duty of care arising from an involuntary commitment or a release therefrom. *Johnson*, 2008-Ohio-596, at ¶ 41. It is a "professional judgment" rule that acknowledges "[t]he inherent difficulty of predicting violent behavior, coupled with the degree of variability exhibited by psychiatrists in clinical practice." *Id.*, citing Nolan, *Ohio Adopts The Professional Judgment Rule*, 15 Dayton L.Rev. 319, 332 (1990).

{¶ 33} The good faith determination under R.C. 5122.34 involves a weighing of a defendant's acts or omissions to determine whether the defendant acted on the basis of a judgment, honestly arrived at, that the subject should be committed or released. *Loughran* at 474; *Griffin v. Twin Valley Psychiatric Systems*, 2003-Ohio-7024, ¶ 119 (10th Dist.). The Ohio Supreme Court has identified several factors to be considered in addressing whether good faith has been exercised, including "the competence and training of the reviewing psychotherapists, whether the relevant documents and evidence

were adequately, promptly and independently reviewed, whether the advice or opinion of another therapist was obtained, whether the evaluation was made in light of the proper legal standards for commitment, and whether other evidence of good faith exists." *Littleton* at 96. A defendant producing evidence as to these factors makes a prima facie showing of good faith. In order to rebut that showing, a plaintiff must show that no reasonable psychiatrist would have committed or released the patient under the circumstances. *Johnson* at ¶ 42, citing *Loughran* at 474.

{¶ 34} In this case, Dr. Lazzara submitted three affidavits to support his motion for summary judgment. Two of the affidavits were from Drs. Keck and Noffsinger, each board certified in psychiatry, who opined that Dr. Lazzara acted lawfully and in good faith in his treatment and discharge of Dustin. In the third affidavit, Dr. Lazzara stated that he is board certified in psychiatry and is licensed to practice medicine in the State of Ohio. Dr. Lazzara further opined that, in his expert opinion, he "acted lawfully and in good faith in [his] treatment and discharge of Dustin Booth." Dr. Lazzara averred that, in his expert opinion, he acted reasonably and complied with the standard of care in all respects in his care and treatment of Dustin.

{¶ 35} In addition to his affidavit, Dr. Lazzara provided deposition testimony in support of his motion for summary judgment. During his deposition, Dr. Lazzara testified that he treated Dustin after his admission to the behavioral health unit. At their initial meeting, Dustin and Dr. Lazzara discussed Dustin's relevant history, including his full mental health history, social history, medications, treatment, substance abuse, interactions, and work. Dr. Lazzara later met with Dustin's mother and Brandi, who supplemented the information provided by Dustin, and informed Dr. Lazzara that Dustin had been vaping cannabis to an excessive amount and that he had stopped heavily drinking a few months prior.

{¶ 36} Throughout Dustin's hospitalization, Dr. Lazzara met with Dustin's family on three occasions. During their meetings, Dr. Lazzara discussed Dustin's diagnosis of Bipolar Disorder I, his treatment plan, and the requirement that Dustin remain on his medications after discharge. At some point, Dr. Lazzara learned that Dustin and Brandi were arguing on the telephone and that Dustin did not want Brandi involved in his treatment or care. At that point, Dr. Lazzara and his team solely communicated with Dustin's mother, who felt "confident and comfortable" with taking Dustin home upon discharge. Dr. Lazzara explained that, although Brandi could have provided additional information to him or his team, they were prohibited from reaching out to Brandi themselves.

{¶ 37} As part of Dr. Lazzara's treatment of Dustin, Dr. Lazzara assessed Dustin's progress on the treatment plan, including Dustin's presentation of mania and medication compliance. This treatment plan involved multiple medications intended to address Dustin's bipolar disorder and mania but would also address any psychosis associated with substance abuse. Regarding any substance abuse disorders, Dr. Lazzara concluded, based upon the information provided to him, that Dustin's mania was not attributed to substance abuse. Notwithstanding this conclusion, Dustin was counseled on information pertaining to cannabis use disorder and was provided literature regarding the same. Dr. Lazzara testified that he and his team "watched for" an alcohol use disorder, and informed Dustin he could relapse given his recent sobriety. According to Dr. Lazzara, even if Dustin had been diagnosed with cannabis use disorder, his treatment plan would not have deviated, though the discharge plan may have included additional instructions that Dustin engage in "AA meetings" and to abstain from drug use for a period of time.

{¶ 38} By the time of Dustin's discharge, Dr. Lazzara had observed improvement from Dustin in many respects. Prior to his discharge, Dustin confirmed, on several

occasions, to Dr. Lazzara and his treatment team that he did not have access to firearms. Dr. Lazzara went through the discharge paperwork with Dustin and Dustin's mother indicated that Dustin had improved and that she was comfortable with his discharge.

{¶ 39} To his motion for summary judgment, Dr. Lazzara also attached the deposition testimony of Dr. Thatcher. As noted above, Dr. Thatcher is Brandi's expert, who was critical of Dr. Lazzara's treatment and diagnosis of Dustin. During his testimony, Dr. Thatcher explained the many ways he believed Dr. Lazzara's treatment of Dustin fell below the standard of care, and identified methods Dr. Lazzara could have used to better treat and diagnose Dustin prior to his discharge.

{¶ 40} Based upon the above evidence, we, like the trial court, find that Dr. Lazzara established a prima facie showing that he acted in good faith pursuant to R.C. 5122.34. That is, when considering Dr. Lazzara's affidavit, his deposition testimony, and the uncontroverted affidavits of Drs. Keck and Noffsinger, we conclude that Dr. Lazzara presented sufficient facts, under the *Loughran* factors, to make a prima facie showing that he acted in good faith in releasing and treating Dustin. *See Johnson*, 2008-Ohio-596, at ¶ 44 (finding that a doctor established a prima facie showing of good faith pursuant to R.C. 5122.34 where he produced an affidavit and the affidavit of an expert stating the same); *Griffin*, 2003-Ohio-7024, at ¶ 120.

{¶ 41} To avoid summary judgment based on R.C. 5122.34 immunity, Brandi was required to rebut Dr. Lazzara's prima facie showing of good faith. In an attempt to rebut such a showing, Brandi claims "there is an abundance of evidence that [Dr. Lazzara] did not act in good faith." In support, Brandi points to various discrepancies and errors in Dr. Lazzara's record keeping; his failure to diagnose Dustin with a substance abuse disorder; uncertainty regarding Dustin's demeanor at the time of his discharge; discrepancies regarding Dr. Lazzara's communication with Dustin's family prior to, and at the time of,

Dustin's discharge; and the failure to fully consider Dustin's vape pen usage and the duration of that usage. In light of this evidence, which Brandi contends the trial court did not consider, Brandi argues several of the *Loughran* factors were in dispute, and therefore, genuine issues of material fact remain regarding Dr. Lazzara's good faith.

{¶ 42} After our review of the record, we disagree that the evidence produced by Brandi refutes Dr. Lazzara's showing of good faith. Although Brandi notes several pieces of evidence that she argues are inconsistent with a showing of good faith, this evidence only concerns the credibility of Dr. Lazzara's deposition testimony and whether Dr. Lazzara's care fell below the objective standard of care applicable in this case. However, whether Dr. Lazzara's conduct fell below the standard of care is not sufficient to rebut his prima facie showing that he acted in good faith. It is well settled that to rebut such a prima facie showing, Brandi must prove that, under the same circumstances, no reasonable psychiatrist would have treated and discharged Dustin in the same way. *See Griffin* at ¶ 119; *Loughran* at 474; *Johnson* at ¶ 42; *see also Yayathi v. Chittiprolu*, 2006-Ohio-6897, ¶ 13. In this case, even if we accepted Brandi's allegations summarized above as true, they do not demonstrate that no reasonable psychiatrist would have released Dustin in this circumstance.

{¶ 43} Additionally, although Brandi disputes the ability of Drs. Keck and Noffsinger to render opinions regarding Dr. Lazzara's subjective good faith, Brandi does not otherwise challenge the validity or reasonableness of their expert opinions. *See Johnson* at ¶ 48 (where the court considered the plaintiff's failure to present evidence that the defendants' experts were not reasonable in its good faith analysis). That is, Brandi did not present any evidence challenging the experts' qualifications or histories of practice, nor did she contradict their statements with her own expert stating that no other physician could have reached the same conclusions as Dr. Lazzara's experts. This is true even

when considering the opinion of Brandi's expert, Dr. Thatcher, who stated that Dr. Lazzara deviated from the standard of care in several ways. Importantly, Dr. Thatcher did not conclude that no reasonable physician would have discharged Dustin under the same circumstances, nor did he offer an opinion regarding Dr. Lazzara's good faith or specifically refute the findings of Dr. Lazzara's experts.[9]

{¶ 44} In light of all the above, we conclude that, at most, the evidence presented by Brandi demonstrates a failure of good practice. It does not demonstrate that in these circumstances no reasonable psychiatrist would have reached the same decision to release Dustin. Therefore, we find there is no genuine issue of material fact that Dr. Lazzara is immune from liability under R.C. 5122.34 and that he is entitled to judgment as a matter of law. As a result, the trial court did not err in awarding summary judgment to Dr. Lazzara on that basis.

{¶ 45} Judgment affirmed.


BYRNE, J., concurs.

PIPER, J., concurs in part and dissents in part.


**PIPER, J., concurring in part and dissenting in part.**

{¶ 46} I concur with the analysis and conclusion of my colleagues regarding the first assignment of error. However, R.C. 5122.34 is so overly broad as to approach

---

9. In his written report, Dr. Thatcher states that his opinions are "supported by professional standard and *most* practitioners would agree are good medical practices." (Emphasis added.)

unconstitutionality.[10] Dr. Lazzara provided mental health services, and his supervision and treatment of involuntarily committed Dustin Booth included procedural and physical assistance in both hospitalization and discharge. However, what saves the statute from an unconstitutional application with an unconscionable result of disregarding circumstances is that the statute also requires some degree of objective analysis in accessing due care.

{¶ 47} Hospitalization placement or discharge must be "appropriate." Additionally, a belief that is "good" (i.e. "good faith") must be founded on actual knowledge or information thought to be reliable. To be "good" the thought process must be reasonable, not malicious or deviant from due care. In other words, to be a "good" faith belief it must reasonably place the patient's well-being as the objective of mental health services provided. Depending on the "person" with a relationship to the patient and claiming to have acted with good faith, the applicable standard of care will vary.

{¶ 48} However, while I agree with our resolution of the first assignment of error, I respectfully disagree with the analysis and conclusion of my colleagues regarding the second assignment of error.

{¶ 49} Within the second assignment of error, the question becomes: did Dr. Lazzara exercise good faith in formulating his professional decision to release Dustin from

---

10. R.C. 5122.34 (A) states: "Persons, including, but not limited to, boards of alcohol, drug addiction, and mental health services and community mental health services providers, acting in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assist in the hospitalization or discharge, determination of appropriate placement, court-ordered treatment, or in judicial proceedings of a person under this chapter, do not come within any criminal provisions, and are free from any liability to the person hospitalized or receiving court-ordered treatment or to any other person." While casting a wide blanket of protection for providers in the uncertain arena of mental health services (and rightfully so), the statute does not define or establish criteria for "good faith." However, the statute also does not abandon the mentally ill in receipt of care from providers. Nevertheless, the statute has resulted in a quagmire of case law which can only be clarified by either the General Assembly or the Ohio Supreme Court.

further care and treatment?[11] Dr. Lazzara and his experts conclude he acted in good faith; Dr. Lazzara moved for summary judgment on the basis he was entitled to immunity.

{¶ 50} On the other hand, Brandi Booth, as the administratrix of Dustin's estate, presents evidence to suggest Dr. Lazzara did not perform his duties of professional care in good faith. She proposes the depositions, records, and her expert's opinion demonstrate that the discharge decision was formulated with multiple examples of incomplete and inaccurate information, indicative of recklessness or haste. The suggestion is that the lack of a thorough diagnosis and evaluation resulted in an unreasonable decision of discharge that did not measure up to professional standards and therefore contradicts the notion that good faith was exercised. Said differently, contravening the assertion of good faith is the evidentiary material suggesting Dustin's well-being was not the focus of due care.

{¶ 51} I would agree with my colleagues that it would be a *matter of law* and ripe for summary judgment if there was a complete absence of evidence which contradicted Dr. Lazzara's claim that he thoroughly and in good faith terminated treatment responsibilities. However, the record is not conclusive that Dr. Lazzara exercised good faith, entitling him to immunity *as a matter of law*. The evidentiary information Dr. Lazzara offers is not unchallenged. In fact, sufficient evidence showed that genuine issues of material fact exist as to whether Dr. Lazzara had acted in good faith in releasing Dustin from his involuntary hospitalization.

{¶ 52} The existence of good faith becomes a factual issue (like most affirmative

---

11. Attached to Dr. Lazzara's motion for summary judgment was Exhibit A showing, among other symptoms, Dustin's commitment was because he suffered depression, schizophrenia, and possessed ideations of having superhero powers. Notably, involuntary commitment contains an even greater aspect of "control" and a "special relationship" than the outpatient circumstance discussed by the Ohio Supreme Court in *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 1997-Ohio-194.

defenses). It was error to grant summary judgment in favor of Dr. Lazzara and against Dustin's estate.

## MOVANT'S AFFIRMATIVE DEFENSE

{¶ 53} "Good faith" requires an examination of all the surrounding circumstances to see if a mental health professional exercised due care in a reasonably acceptable manner considering professional standards. While there is a subjective element to diagnosis, treatment, and discharge, a physician's assertion of "good faith" does not automatically, regardless of circumstances, create immunity from liability. Like other mental states, the internal thought processes can only be determined by examining the physician's behavior and factual considerations prior to making decisions.[12] This makes the statutory affirmative defense susceptible to becoming a mixed question of law and fact. Regretfully, the General Assembly created the affirmative defense of exercising decisions in "good faith" without providing criteria, or a definition, to determine if "good faith" existed prior to exercising decisions of diagnosis, treatment and discharge.

### *Dr. Lazzara's Argument and Evidence in Support of Summary Judgment*

{¶ 54} As the movant for summary judgment, Dr. Lazzara's argument was rather brief and direct; because he is experienced and highly educated to treat patients like Dustin, and because he supervised Dustin's treatment and was aware of the treatment prior to discharge, his decision to have Dustin released from care was exercised in good faith. Dr. Lazzara proposes the information he relied upon entitles him immunity and prevents any scrutiny of his treatment or diagnosis during hospitalization as well as the decision to discharge.

---

12. It remains well known in criminal jurisprudence that one cannot look into the mind of another and that mental states (thought processes) which involve knowledge are determined from all the facts and circumstances in evidence. *State v. Moody*, 2022-Ohio-2529, ¶ 15, fn.1 (12th Dist.), citing *State v. Conley*, 2021-Ohio-2638, ¶ 30 (3d Dist.).

{¶ 55} Most relevant, Dr. Lazzara submitted his affidavit indicating that Dustin's responses to treatment and Dustin's statements all supported a good faith decision to release Dustin. To bolster his opinion, Dr. Lazzara also submitted conclusive affidavits "on top of his own" from two other doctors that opined that Dr. Lazzara acted lawfully and in good faith.[13] In support of their conclusions Dr. Lazzara also filed transcripts of various depositions.

{¶ 56} The question turns to whether in exercising professional judgment Dr. Lazzara was sufficiently aware of Dustin's interactions with staff, his inconsistent statements, and Dustin's behavior during treatment. In other words, after a thorough review and evaluation of the records, and in consideration of the extent of his mental illness, was Dustin ready to be put out into the mainstream of society with appropriate after-release support?

### *Brandi's Evidence In Response to Dr. Lazzara's Evidence for Summary Judgment*

{¶ 57} To debunk Dr. Lazzara's "good faith" decision in releasing Dustin, Brandi submitted depositions from three hospital team members who made notations of their contacts with Dustin: a nurse practitioner, a clinical counselor, and a social worker. The essence of which was to demonstrate that Dr. Lazzara failed to review and consider significant information, thereby impugning Dr. Lazzara's claim (and the claims of his experts) that Dr. Lazzara exercised good faith and therefore immunity applied. To enhance the claim that Dustin's release was ill-planned or premature, Brandi points to inconsistent statements and other information that was contraindicated regarding Dr. Lazzara's assessment and diagnosis of Dustin and the discharge decision. Brandi also points to records as being "cut-and-pasted" raising an inference of haste or the lack of

---

13. None of experts represented familiarity with the law or qualifications to judge when conduct is lawful.

proper attention before considering the need for continuing care.

{¶ 58} Equally important, and as referenced by the majority, Brandi provided an opinion from Dr. Thatcher, as an opposing expert, who stated:

> It is my opinion, with reasonable medical certainty, that Dr. Lazzara deviated from the standard of care while treating Dustin Booth as an inpatient psychiatric patient at Atrium Medical Center from 2/1/2022 to 2/7/2022. Dr. Lazzara deviated below the standard of care when:
>
> 1. He failed to gather collateral information from family members by communicating with them after they had reached out to him for consultation . . .
>
> 2. He failed to properly diagnose Mr. Booth with 2 substance use disorders: alcohol use disorder and cannabis use disorder . . .
>
> 3. He failed to offer FDA approved medications and evidence-based treatments for substance abuse disorders.
>
> 4. He discharged Mr. Booth prematurely in an unsafe mental state . . .
>
> 5. He failed to create and implement a discharge plan that adhered to prevailing standards that prioritize patient and community safety . . .

Dr. Thatcher opined to a reasonable degree of certainty that Dr. Lazzara failed to properly utilize the civil commitment system to maximize the safety of Dustin and further that Dustin suffered harm from Dr. Lazzara's departure from the standard of care regarding the deviations referenced in his opinion.

{¶ 59} A mental health provider's deviation from the required standards of care which may possibly jeopardize a patient's safety must be justifiable and acceptable, in other words exercised in good faith. The testimony and evidence indicating Dr. Lazzara acted with inaccurate and incomplete information and without proper diagnosis and absent an appropriate treatment plan all challenge Dr. Lazzara's assertions that Dustin's release was exercised in good faith. Nowhere in the record are the deviations rebutted

and supported with evidentiary material to be justifiable and acceptable within standards of the profession. Even if the record contained such, it would simply be a battle of the experts to be determined by the trier of fact. *Gysegem v. Ohio State University Wener Medical Center,* 2021-Ohio-4496, ¶ 74 (10th Dist.) (It is in the province of a trier of fact to weigh the care being debated between a battle of experts.).

{¶ 60} My colleagues suggest Brandi's summary judgment evidence "only concerns the credibility" of Dr. Lazzara's testimony and that a "good faith determination under R.C. 5122.34 involves a *weighing* of [Dr. Lazzara's] acts or omissions to determine whether [he] acted on the basis of a judgment, honestly arrived at." My colleagues inadvertently diminish the weight of Brandi's evidence by acknowledging that "the evidence presented by Brandi demonstrates a failure of good practice." Yet the failure of "good practice" could easily result in a failure of "good faith" when evaluated and weighed by a trier of fact.

{¶ 61} The questions that arise are clearly for a jury to determine, not a summary judgment proceeding.

### *Havely v. Franklin Cty* – Unavoidable Questions of Fact

{¶ 62} Both parties produced evidence which hinges on credibility and a weighing of the evidence as to whether Dustin should have been released after a thorough assessment and evaluation of his condition; the matter is clearly not to be resolved by way of summary judgment. A court should not choose among reasonable inferences or weigh the credibility of witnesses in deciding whether summary judgment is appropriate. *Havely v. Franklin Cty*., 2008-Ohio-4889, ¶ 36 (10th Dist.).

{¶ 63} In *Havely* the court considered whether appellants met their reciprocal burden to counter appellees' denials with sufficient facts to preclude summary judgment. The court's analysis concluding that summary judgment was inappropriate,

- 23 -

acknowledged that the attendant circumstances surrounding the competing testimony placed the witnesses' credibility in question. "[W]here the potential for bias and interest is evident—then, the matter should be resolved at trial, where the trier of facts has an opportunity to observe the demeanor of the witness." *Id.* at ¶ 37.

{¶ 64} The potential for bias and self-interest is evident for both parties. The reasoning in *Havely* becomes particularly cogent here.

The Significance of *Littleton v. Good Samaritan Hosp.& Health Center*

{¶ 65} My colleagues suggest that the Ohio Supreme Court identified specific factors to be considered when evaluating the existence of good faith in *Littleton v. Good Samaritan Hosp.& Health Center*, 39 Ohio St.3d 86, 96 (1988). However, the Supreme Court was merely discussing a federal court's "psychotherapist judgment rule" which it did not specifically adopt. Instead, *Littleton* adopted the "professional judgment rule" and specifically listed considerations to be undertaken. *See id*. at 99.

{¶ 66} In discussion of the "professional judgment rule" when considering a patient's discharge, *Littleton* found a thorough evaluation of the patient's propensities important. *Littleton* discussed a good faith determination by the psychiatrist that the patient had no violent propensity, or if patient possessed violent propensities, a thorough evaluation of the severity of those propensities. Upon evaluation of the propensities involved, a treatment plan could be formulated in good faith which may incorporate a discharge. *Id.* at 99. Essential to this reasoning is the need for an informed, thorough evaluation of the patient's responses to treatment, ability to comply, and the after-release comprehensive plan. Brandi's expert calls all of this into question, which was unrebutted by Dr. Lazzara.

{¶ 67} *Littleton* rightfully recognized that diagnosing violent propensities was a highly subjective endeavor. However extremely significant is also the recognition that a

psychiatric patient is not required to assume the risk of improper treatment. *Id*. at 97-99. In other words, a treating psychiatrist merely alleging "good faith" is generally insufficient to establish the affirmative defense of immunity; good faith must be sufficiently demonstrated by all the surrounding circumstances and all the information that would have reasonably been considered when making professional decisions of care.

{¶ 68} Additionally, one should note a close reading of *Littleton* suggests that the professional judgment rule applies in circumstances where there are no professional standards, such as where the release of a patient results in harm to a third party with whom the doctor has no relationship. *Yurkowski v. Univ. of Cincinnati,* 2013-Ohio-242, ¶ 26 (10th Dist.). The professional judgment rule is to be used when standards cannot be determined, otherwise traditional malpractice rules apply in evaluating the applicable standard of care.

{¶ 69} The guidance in *Littleton* and analysis in *Yurkowski* are particularly cogent to the case herein. Here there is more than sufficient evidence in Dustin's ongoing treatment records that his reporting was inconsistent and his compliance questionable. There appears to be a reasonable inference that relevant information was not considered and that pertinent sources of information as well as after-release support for Dustin were not in place. There is no suggestion of a thorough evaluation or assessment for self-harm or propensity for violence. Dr. Lazzara failed to rebut the evidentiary material that Brandi submitted indicating Dustin was not properly or fully diagnosed prior to his release. Further there is evidentiary material alleging that the decision to release Dustin under the circumstances fell below acceptable standards of care and that multiple deviations from those standards of care took place. This is established when considering the depositions and records submitted by Brandi combined with Dr. Thatcher's testimony and affidavit— all of which could easily be determined by a trier of fact to contradict the existence

decisions exercised in good faith.

{¶ 70} While Dr. Lazzara attempts to explain away several of Brandi's concerns about the records, Brandi's evidentiary materials lend to reasonable inferences that if believed disfavor summary judgment.

### Conclusion

{¶ 71} Dr. Lazzara's affidavits were carefully constructed to conclude that Dustin's care and discharge were reasonably adequate and therefore support his defense of immunity due to his good faith. Such might prove correct at trial. Dr. Lazzara's experts, conclusively vouching for Dr. Lazzara, may well be more believable than Brandi's expert—*at trial*. Yet at this point we must also acknowledge the failure of "best practices" may also amount to a failure of "good faith," which may negate the defense of immunity. Regardless, summary judgment is not the place we decide which pieces of testimony are more credible or which inferences are more reasonable.[14]

{¶ 72} The circumstances require what the law prefers—a day in court. The trial court's grant of summary judgment in favor of Dr. Lazzara should be reversed.

---

14. Nothing in this dissent should be construed as indicating which party may prevail at trial. Mental illnesses are often not curable, however, mitigating the symptomology and intensity of the disorder or mental disturbance is possible with proper treatment and medication. I agree with suggestions that diagnosis, treatment, and discharge should receive wide latitude if reasonable under the circumstances and that if thoroughness is evident throughout, good faith may have been exercised; but nevertheless, standards of professional care are owed the mentally ill as they are owed any other citizen.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge


___(concurs in part and dissents in part)____
Robin N. Piper, Judge


/s/ Matthew R. Byrne, Judge